**TA LEGAL GROUP PLLC**
Taimur Alamgir, Esq.
205 E Main Street, Ste. 3-2
Huntington, NY 11743
(631) 498-7984
tim@talegalgroup.com
*Attorneys for Plaintiff Andrew Meyer*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANDREW MEYER,<br><br>Plaintiff,<br><br>v.<br><br>ECLYPSES, INC., DAVID GOMES, AND JOSEPH F. OLIVERI<br><br>Defendants. | **Case No.**<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff Andrew Meyer ("Plaintiff" or "Mr. Meyer"), by his attorneys, TA Legal Group PLLC, hereby files this Complaint against Defendants Eclypses, Inc. ("Eclypses"), David Gomes ("Gomes"), and Joseph F. Oliveri ("Oliveri") (collectively, "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1. Eclypses recruited Mr. Meyer into what was presented as a high-upside senior go-to- market role at a cybersecurity company poised for growth, meaningful capitalization, and equity- backed opportunity. This was all a facade.

2. Eclypses unlawfully misrepresented the company's financial prospects in order to cheat Mr. Meyer out of his wages and time with promises that leadership had no intent of fulfilling. Eclypses routinely delayed Mr. Meyer's wages, withheld overtime despite a plainly non-exempt sales role, disrupted or diluted commission opportunities that he originated and developed, and

then terminated him in response to protected activity and in an egregious effort to avoid paying him substantial commissions.

3. Defendants repeatedly delayed Mr. Meyer's salary and commissions, failed to pay overtime for approximately 15 to 20 hours per week while misclassifying him as exempt, disrupted or diluted commission opportunities he originated and developed, and terminated him after he complained about late wages and commissions and before a major account he developed could generate its expected value.

4. Mr. Meyer seeks unpaid overtime under the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"), unpaid and untimely paid wages and commissions under the NYLL, relief for retaliation under NYLL § 215, contractual and quasi-contractual relief, damages for fraud and misrepresentation, relief arising from securities fraud and the equity component of his compensation, damages for breach of fiduciary duty, and all other relief stated below.

## PARTIES

5. Plaintiff Andrew Meyer is an individual who resides in Suffolk County, New York. During the relevant period, he performed work for Eclypses largely from his home in Suffolk County, New York.

6. Defendant Eclypses, Inc. is a U.S.-based cybersecurity company with an office at 33 Broad Street, 11th Floor, Boston, Massachusetts 02109. Eclypses is a resident of the state of Massachusetts for diversity jurisdiction purposes.

7. Eclypses focuses on application and data security and markets itself as a provider of quantum-resistant security technology for the artificial-intelligence, cloud, and Internet-of-Things era.

8. Eclypses's flagship technology is MicroToken Exchange® ("MTE"). Eclypses represents that MTE protects the data payload itself by transforming each message into a unique, one-time-use data object designed to defend against API attacks, replay and injection attacks, AI-driven cyberattacks, man-in-the-middle attacks, and future quantum-computing risks.

9. Defendant David Gomes, an individual domiciled in the state of Massachusetts, is Eclypses's Chief Executive Officer and a member of its Board of Directors. At all relevant times, Gomes exercised operational control over Eclypses, including control over customer relationships, pricing, compensation, payroll practices, and Mr. Meyer's employment. Gomes acted directly and indirectly in Eclypses's interest in relation to Mr. Meyer and was his employer within the meaning of the FLSA and NYLL.

10. Gomes's operational control included authority over Mr. Meyer's conditions of employment and compensation, including pricing and the key NHTSA/DOT account in ways that directly affected Mr. Meyer's assigned work and commissions; authority over payroll practices and the rate and method of compensation; and participation in the pricing changes, account-control decisions, and termination that affected Mr. Meyer's pay and employment. Gomes therefore possessed and exercised control over compensation, employment conditions, and termination and was an "employer" under the economic-reality and totality-of-the-circumstances standard applicable to the FLSA and, as applied by district courts in this Circuit, the NYLL.

11. Defendant Joseph F. Oliveri, an individual domiciled in the state of Massachusetts, is Eclypses's Chairman of the Board. Oliveri personally possessed and exercised authority to set or approve Mr. Meyer's compensation or commission plan; directed or approved payroll practices; supervised the managers who controlled Mr. Meyer's employment; received and acted on compensation or payroll reports; approved or directed the pricing change that reduced Mr. Meyer's

commissions; and participated in and approved the decision to terminate Mr. Meyer. By virtue of that employment-specific operational control—not merely his title or generalized corporate authority—Oliveri acted directly or indirectly in Eclypses's interest in relation to Mr. Meyer and was his employer within the meaning of the FLSA and NYLL. The relevant inquiry considers authority over hiring and firing, supervision or control of work schedules or conditions, determination of the rate or method of payment, and maintenance of employment records, based on the totality of the circumstances

12. During the relevant period, Eclypses leadership also included Chief Technology Officer Jefferson Dance, his success as CTO, Adam McElroy, Dan Curtis as Chief Financial Officer, and Larry Murray as a senior leadership figure.

**JURISDICTION AND VENUE**

13. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Mr. Meyer asserts claims under the FLSA, 29 U.S.C. §§ 201 et seq.

14. This Court also has diversity jurisdiction because there is complete diversity between Plaintiff and Defendants, and because the amount in controversy exceeds $75,000.

15. This Court has supplemental jurisdiction over the related New York statutory and common-law claims under 28 U.S.C. § 1367 because all claims arise from the same employment relationship, compensation arrangements, representations, complaints, and termination.

16. Venue is proper in this District under 28 U.S.C. § 1391 because [a substantial part of the events or omissions giving rise to these claims occurred in this District and Mr. Meyer performed his work here].

17. The Court has personal jurisdiction over Defendants because Defendants transacted business in this State, employed Mr. Meyer to work in New York, and committed acts giving rise to these claims in or directed into this State.

## FACTUAL ALLEGATIONS

### Recruitment, Compensation, and Equity Representations

17. Mr. Meyer has a long record of strong performance in software sales.

18. Eclypses recruited him in early 2024 as a senior sales and go-to-market hire.

19. Mr. Meyer joined Eclypses in February 2024 with the title Senior Sales Director. He remained employed for approximately two years and two months, until Defendants terminated him on April 30, 2026.

20. Mr. Meyer joined based on false representations—namely that Eclypses had raised $28,863,816 and had 85,339 available shares from equity plans.

21. Defendants represented that Eclypses offered meaningful capitalization and equity upside.

22. Mr. Meyer's offer provided a weekly salary of $3,846.15 for his first six months, equivalent to $200,000 annually, including a non-recoverable draw of $2,083.33 per month to be offset against first-year commissions. Thereafter, his weekly salary was $3,365.38, equivalent to $175,000 annually. His compensation also included 2,000 stock options.

23. Eclypses informed Mr. Meyer that he would be paid monthly on the final working day of each month.

24. Dance described Eclypses and its technology as a transformational opportunity and conveyed that Eclypses could become a major cybersecurity success story.

25. During recruitment and onboarding in early 2024, Dance (acting on behalf of Eclypses) specifically represented that approximately $10 million was coming into Eclypses around the time Mr. Meyer joined.

26. Dance represented that this capital would permit a true go-to-market buildout, including marketing, trade shows, lunch-and-learns, travel, sales tooling, demand generation, sales enablement, and customer and partner development.

27. Dance also stated that customers such as Lululemon and Roche were coming onboard. They never did.

28. Mr. Meyer relied on the funding, growth, resources, customer, and equity representations when he accepted Eclypses's offer, including its salary-plus-commission structure and promised 2,000 stock options.

**<u>Actual Duties and Working Hours</u>**

27. Although Eclypses gave Mr. Meyer the title Senior Sales Director, his actual function was that of an individual salesperson – clearly a non-exempt rol. He did not manage a department, supervise employees, hire or fire anyone, control budgeting, or set company policy.

28. Mr. Meyer's primary duty was selling Eclypses products, developing customer relationships, and attempting to build pipeline under tight company control.

29. Mr. Meyer regularly worked approximately 55 to 60 hours per week and never received overtime compensation.

30. Mr. Meyer performed his work largely from home because Eclypses would not adequately fund in-person sales activity. He supervised no one, exercised limited discretion, and operated under tight budget and process constraints.

31. Eclypses management micromanaged Mr. Meyer's performance, limited or blocked access to certain executive-level customer relationships, controlled pricing and messaging, failed to provide a meaningful budget, and refused to provide resources necessary for ordinary enterprise sales functions.

32. Mr. Meyer was not responsible for budgeting, lead-generation strategy, pricing, product-market strategy, sales enablement, or selecting the market segments Eclypses would pursue.

**Commission Agreement**

33. Eclypses and Mr. Meyer entered into a 2025 Sales Commission Agreement effective January 1, 2025, with an annual quota of $1,250,000.

34. The agreement promised commissions equal to 15% of gross revenue for direct sales, 15% of gross revenue for company-signed reseller sales, 10% of gross revenue for company-signed referral sales, and an additional 5% special performance incentive fund, or SPIF, on gross revenue above the annual quota.

35. The agreement stated that commissions would be paid after Eclypses received payment from the customer, and that advance approval by the Chief Revenue Officer for agreed commission splits on collaborative opportunities – but not for commissions otherwise available under the agreement.

**Operational and Financial Instability**

36. The recruitment representations proved false or materially misleading. Over nearly the entire employment relationship, Eclypses operated with severe cash constraints, inconsistent payroll practices, weak leadership direction, unclear messaging, unclear pricing, and no meaningful, repeatable go-to-market structure.

37. Eclypses was not operationally ready for a senior sales hire when it recruited Mr. Meyer, yet Defendants held him responsible for results in an environment that materially prevented success.

38. At the AWS Federal Summit in June 2025, Gomes admitted to Mr. Meyer that Eclypses had brought Mr. Meyer in too early and that the company was not ready. In the same conversation, Gomes discussed his fundraising ambitions with Mr. Meyer, but was unable to raise any substantial investment.

39. In 2024, Eclypses lacked sufficient marketing resources, a meaningful sales structure, a clear ideal customer profile or hunting strategy, structured enablement, and institutional knowledge transfer. It repeatedly shifted messaging and positioning, maintained unclear or unsettled pricing, and lacked funding necessary for normal enterprise sales execution.

40. Eclypses had no meaningful marketing engine, provided little or no travel and entertainment budget, reimbursed expenses unreliably, and effectively required Mr. Meyer to work virtually even though senior enterprise sales work requires in-market presence.

41. The lack of funding prevented standard enterprise sales activity, including on-site meetings, trade shows, lunches, conferences, customer visits, and relationship-building. It deprived Mr. Meyer of the ability to create pipeline, accelerate deals, and develop executive relationships in the ordinary way.

42. Eclypses's Director of Marketing, Faye Danis, left in late March or April 2024, further weakening the company's already limited marketing support.

43. At an AWS Summit in New York City in approximately July 2024, Dance allegedly circulated an inappropriate image through a work-related text or social-messaging chain that included a female colleague.

44. During work-related travel in New York City, Dance also displayed unprofessional alcohol-related behavior. In one incident, Mr. Meyer and his manager became stuck in a hotel-elevator situation involving Dance while Dance was intoxicated.

45. In approximately November 2025, Dance reportedly was sentenced in connection with a prior drunk-driving vehicular-manslaughter incident that predated his joining Eclypses. Mr. Meyer understands that Dance is imprisoned in Canada in connection with that matter.

46. By 2025, Eclypses still had not solved basic go-to-market issues. It took nearly two years to clarify that Infrastructure as a Service and Platform as a Service targets were the most logical market.

47. Eclypses had strong technology but weak commercial execution. No meaningful customers were being signed beyond Lululemon. Sales lacked budget and support for travel, events, lunch-and-learns, and customer-facing programs, while leadership continued changing messaging and positioning without proper enablement.

48. Dance frequently served as a primary technical and pre-sales resource on Mr. Meyer's customer and prospect calls but often created additional difficulty. Meetings sometimes ran materially beyond their intended end time because Dance continued technical discussions without regard to meeting discipline or sales process.

49. Based on his enterprise-sales experience, Mr. Meyer attempted to coach meeting flow, executive engagement, and sales-process management, but Defendants did not consistently receive those efforts.

**Repeated Late Salary and Commission Payments**

47. In 2025 and 2026, Eclypses repeatedly failed to pay Mr. Meyer on the promised final working day of the month.

48. The following chart reproduces the late payment history:

| Year | Month | Payment Status or Date | Timing | Calendar Days Late |
|---|---|---|---|---|
| 2025 | January | Timely | Paid on time | 0 |
| 2025 | February | Timely | Paid on time | 0 |
| 2025 | March | April 3, 2025 | Paid late | 3 |
| 2025 | April | May 1, 2025 | Paid late | 1 |
| 2025 | May | June 26, 2025 | Paid late | 27 |
| 2025 | June | July 31, 2025 | Paid late | 31 |
| 2025 | July | August 15, 2025 | Paid late | 15 |
| 2025 | August | Timely | Paid on time | 0 |
| 2025 | September | October 20, 2025 | Paid late | 20 |
| 2025 | October | November 12, 2025 | Paid late | 12 |
| 2025 | November | Timely | Paid on time | 0 |
| 2025 | December | February 10, 2026 | Paid late | 41 |
| 2026 | January | February 13, 2026 | Paid late | 14 |
| 2026 | February | Timely | Paid on time | 0 |
| 2026 | March | April 8, 2026 | Paid late | 8 |
| 2026 | April | Timely | Paid on time | 0 |

49. Commission payments were also not paid to Mr. Meyer in a timely manner, or at all.

50. Mr. Meyer repeatedly complained to Eclypses about late salary and late commission payments.

**<u>Commission Agreement and the NHTSA/DOT Opportunity</u>**

50. Mr. Meyer received no commissions at all from Eclyspses in fiscal year 2025 or fiscal year 2026.

51. Mr. Meyer developed and maintained a key relationship with the National Highway Traffic Safety Administration ("NHTSA") within the United States Department of Transportation ("DOT").

52. He cultivated the NHTSA relationship over an extended period, remained actively involved in a complex implementation for roughly one year, and worked closely with implementation partner Tantus, including his primary contact there, Atul Apte.

53. Despite Mr. Meyer's role in originating and developing the NHTSA/DOT opportunity, Gomes inserted himself directly into the customer relationship, including communications with Bill Berry, NHTSA's Chief Information Security Officer, and limited or blocked Mr. Meyer's direct executive-level involvement.

54. Gomes nevertheless communicated that he needed Mr. Meyer's continued involvement on the DOT account because of the operational knowledge and relationship capital Mr. Meyer had built.

55. Those discussions included possible expansion into a significant enterprise license agreement, potentially in the seven-figure range.

56. On or about March 24, 2025, Eclypses implemented a major pricing change driven by Dance and adopted by Gomes. Defendants reduced pricing by approximately 99% based on the view that price was the primary barrier to sales.

57. Defendants implemented that pricing change abruptly and without any structured transition plan, deal protection, or compensation adjustment for in-flight opportunities.

58. Before the pricing change, the NHTSA opportunity had been quoted at approximately $240,000. Mr. Meyer understood that NHTSA had not raised any material objection to price.

59. After the pricing change, Eclypses repriced the NHTSA deal to approximately $1,000, at which point the customer purchased. Under Mr. Meyer's commission plan, that

repricing reduced his expected commission from approximately $37,500 to approximately $150, a direct difference of approximately $37,350.

60. Defendants did not provide meaningful protection for Mr. Meyer's opportunities already cultivated at the original price point. The pricing collapse did not produce meaningful customer acquisition at scale or solve Eclypses's deeper commercial problems.

61. Eclypses later shifted pricing again from container-based to consumption-based models. Gomes later acknowledged that earlier pricing decisions, including the March 2025 reduction, were mistakes.

62. In approximately April 2026, shortly before Mr. Meyer's termination, Eclypses moved to a consumption or transactional model intended to support larger-scale enterprise adoption. Under the later model, NHTSA account is now positioned to pay full price.

63. Mr. Meyer is entitled, at minimum, to origination-based commission credit and post-termination commissions tied to the value he created in the NHTSA/DOT account.

64. Other sales personnel remained employed despite similarly long enterprise-sales cycles and the absence of materially significant closed revenue on large opportunities. Defendants terminated Mr. Meyer before the value of the opportunity he developed could be realized.

**Protected Complaints and Termination**

69. Mr. Meyer complained to Eclypses in good faith about late salary and deprivation of commission payments, conduct he reasonably believed violated the NYLL, in excess of 10 times.

70. These each protected complaints occurred on or shortly after each time that Defendants failed to pay him on time. The most recent complaint about delayed compensation was

in early April 2026 after Eclypses failed to meet its obligation to pay Mr. Meyer on or before the last day of the month for the tenth time.

71. Defendants did not correct the recurring late-payment problem after Mr. Meyer complained. Instead, they continued the practice and terminated Mr. Meyer on Thursday, April 30, 2026.

72. The termination cut off Mr. Meyer's continued participation in the accounts, commissions, and related upside he had developed, including the NHTSA/DOT account.

73. On May 4, 2026, Mr. Meyer texted Gomes and proposed a consulting arrangement for the DOT account and related relationships, including Tantus, AWS, and Four Points, on a commission-only basis.

74. Gomes acknowledged that message positively, including by responding with a thumbs-up. That response confirmed the parties' understanding that commission participation on those sales could continue after termination.

75. Despite Gomes's positive acknowledgment, no consulting arrangement materialized.

**FIRST CAUSE OF ACTION**
**Unpaid Overtime Under the FLSA**

75. Mr. Meyer repeats and realleges the preceding paragraphs.

76. Defendants employed Mr. Meyer within the meaning of the FLSA and were engaged in interstate commerce or had employees engaged in interstate commerce.

77. Mr. Meyer regularly worked approximately 55 to 60 hours per week. Defendants knew or had reason to know of his work but failed to pay him one and one-half times his regular rate for hours over 40.

78. The executive exemption does not apply because Mr. Meyer did not manage a department, direct the work of two or more employees, supervise anyone, or possess hiring or firing authority. His primary duty was individual sales work.

79. The administrative exemption does not apply because Mr. Meyer sold to particular prospects and accounts under management control and did not exercise discretion and independent judgment on matters of significance affecting Eclypses's general business operations.

80. The highly compensated employee exemption does not apply because Mr. Meyer did not customarily and regularly perform an exempt duty.

81. The commissioned retail-or-service-employee exemption does not apply because Eclypses is a business-to-business cybersecurity company selling enterprise technology to institutional clients, government customers, partners, and sophisticated business purchasers, and commissions did not comprise more than half of Mr. Meyer's compensation during any representative period.

82. The outside-sales exemption does not apply because Mr. Meyer performed his primary duty from his home and Defendants' lack of budget, travel support, reimbursement support, and customer-facing resources effectively required virtual work.

83. Defendants' violations were willful. Mr. Meyer is entitled to unpaid overtime, an equal amount as liquidated damages, prejudgment interest to the extent permitted, attorneys' fees, costs, and other relief under 29 U.S.C. §§ 207, 216, and 255.

## SECOND CAUSE OF ACTION
## Unpaid Overtime Under the NYLL

84. Mr. Meyer repeats and realleges the preceding paragraphs.

85. Defendants failed to pay Mr. Meyer one and one-half times his regular rate for hours over 40, in violation of the NYLL and 12 N.Y.C.R.R. § 142-2.2.

86. The executive and administrative exemptions do not apply for the reasons stated above. New York does not recognize the FLSA's highly compensated employee exemption. Mr. Meyer also did not regularly and directly perform qualifying administrative work for an employer, executive, or administrator.

87. Defendants failed to maintain complete and accurate records of Mr. Meyer's hours and pay, including total daily and weekly hours, gross wages, wage rate, and applicable work agreement, as required by law.

88. Mr. Meyer is entitled to unpaid overtime, liquidated damages, prejudgment interest, attorneys' fees, costs, and other relief under the NYLL.

**THIRD CAUSE OF ACTION**
**Unpaid Commissions Under the NYLL**

89. Mr. Meyer repeats and realleges the preceding paragraphs.

90. Mr. Meyer was a commission salesperson covered by the written 2025 Sales Commission Agreement. His principal activity was selling, his earnings were based in part on commissions, and his principal activity was not supervisory, managerial, executive, or administrative. The agreement established commission formulas, required payment after Eclypses received customer payment, and did not provide for forfeiture at termination.

91. Defendants failed to pay earned commissions and commissions attributable to accounts and opportunities Mr. Meyer originated, cultivated, or materially advanced, including NHTSA/DOT and its expansion, renewal, enterprise-license, and post-termination value.

92. Once earned, those commissions were wages that could not be forfeited. Mr. Meyer seeks the unpaid commissions, including at least the approximately $37,350 differential caused by the NHTSA repricing, liquidated damages, interest, attorneys' fees, costs, and other relief under NYLL §§ 191 and 198.

**FOURTH CAUSE OF ACTION**
**Untimely Payment of Wages and Commissions Under the NYLL**

93. Mr. Meyer repeats and realleges the preceding paragraphs and the late-payment chart.

94. Defendants repeatedly paid Mr. Meyer's salary after the promised and legally required payday and also paid commissions late. Belated payment did not cure the statutory violations.

95. Mr. Meyer seeks all statutory and compensatory remedies available under NYLL §§ 191 and 198, including liquidated damages, interest, attorneys' fees, and costs.

**FIFTH CAUSE OF ACTION**
**Retaliation Under NYLL Section 215**

96. Mr. Meyer repeats and realleges the preceding paragraphs.

97. Mr. Meyer engaged in protected activity by repeatedly complaining in good faith about late salary and commission payments.

98. Defendants knew of his protected complaints, continued the late-payment pattern, and terminated him on April 30, 2026, cutting off his participation in valuable accounts and commissions.

99. The temporal sequence, continued violations, commission consequences, and Defendants' conduct support an inference that Mr. Meyer's protected complaints were a motivating factor in the termination and related adverse actions.

100. Mr. Meyer seeks lost compensation, liquidated damages, reinstatement or front pay as appropriate, civil penalties, attorneys' fees, costs, and all other relief authorized by NYLL § 215.

**SIXTH CAUSE OF ACTION**
**Breach of Contract**

101. Mr. Meyer repeats and realleges the preceding paragraphs.

102. The offer and 2025 Sales Commission Agreement were valid contracts requiring Eclypses to pay salary, commissions, and equity compensation according to their terms.

103. Mr. Meyer performed his obligations. Eclypses breached by failing to make timely payments and failing to pay commissions connected to NHTSA/DOT and other opportunities, including post-termination commissions not forfeited under the agreement.

104. Mr. Meyer suffered damages in an amount to be determined at trial, including the approximately $37,350 NHTSA commission differential, downstream commissions, the value of promised stock options, interest, costs, and other consequential relief permitted by law.

**SEVENTH CAUSE OF ACTION**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**

105. Mr. Meyer repeats and realleges the preceding paragraphs and pleads this claim in the alternative to the extent it is not duplicative of his contract claim.

106. Eclypses exercised contractual discretion in bad faith by starving Mr. Meyer's role of promised support, altering pricing and deal economics without protection for in-flight opportunities, controlling his access to the NHTSA relationship, and terminating him before he could receive the fruits of the bargain.

107. That conduct deprived Mr. Meyer of salary, commissions, equity value, and the benefit of the employment and commission agreements.

**EIGHTH CAUSE OF ACTION**
**Promissory Estoppel**

108. Mr. Meyer repeats and realleges the preceding paragraphs and pleads this claim in the alternative.

109. Defendants made clear and unambiguous promises of salary, commissions, 2,000 stock options, imminent funding, and a properly resourced go-to-market opportunity.

110. Defendants reasonably expected Mr. Meyer to rely on those promises. Mr. Meyer did so by accepting employment and devoting more than two years of labor to Eclypses. Enforcement is necessary to avoid injustice.

## NINTH CAUSE OF ACTION
## Fraudulent Inducement and Intentional Misrepresentation

111. Mr. Meyer repeats and realleges the preceding paragraphs.

112. During recruitment and onboarding, Dance, acting for Eclypses and with the knowledge and participation of its leadership, represented that approximately $10 million was coming into Eclypses; the capital would support marketing, trade shows, lunch-and-learns, travel, sales tools, demand generation, sales enablement, and customer and partner development; customers including Lululemon and Roche were coming onboard; and Eclypses offered meaningful growth and equity upside.

113. Those statements concerned present capitalization, anticipated funding grounded in information peculiarly within Defendants' knowledge, operational readiness, customer prospects, and the value of the 2,000 stock options offered as compensation. They were material and false or materially misleading when made.

114. Defendants knew the representations were false or made them recklessly without regard for their truth, intending that Mr. Meyer rely on them and accept the position.

115. Mr. Meyer reasonably relied on the representations by accepting the position and compensation structure and devoting more than two years of labor. He suffered delayed and unpaid compensation, impaired commission opportunities, lost time and alternative opportunities, and worthless or materially impaired equity expectations.

**TENTH CAUSE OF ACTION**
**Negligent Misrepresentation**

116. Mr. Meyer repeats and realleges the preceding paragraphs and pleads this claim in the alternative.

117. Defendants possessed unique and superior knowledge of Eclypses's capitalization, anticipated funding, payroll stability, operating capacity, equity plans, and ability to support enterprise sales. By specifically supplying that information to induce Mr. Meyer's acceptance of a compensation package containing equity, Defendants assumed a duty to provide correct information.

118. Defendants lacked a reasonable basis for their representations. The actual conditions were severe cash constraints, inconsistent payroll, insufficient marketing and sales structure, little or no travel and entertainment budget, unreliable expense reimbursement, unstable pricing and messaging, and a virtual-sales environment that prevented ordinary enterprise sales execution.

119. Mr. Meyer reasonably relied on the false information and suffered the damages alleged above.

**ELEVENTH CAUSE OF ACTION**
**Fraudulent Concealment and Material Omissions**

120. Mr. Meyer repeats and realleges the preceding paragraphs.

121. While making partial affirmative statements about funding, customers, resources, growth, and equity, Defendants concealed material facts concerning funding shortfalls, payroll instability, the inability to support enterprise sales, unstable pricing and messaging, and the real value of the promised equity.

122. Those omitted facts were uniquely within Defendants' control, including internal capitalization, funding prospects, payroll stability, sales budgets, board-level funding information, and equity-plan materials. Defendants had a duty to complete and correct their partial statements.

123. The omissions were material to Mr. Meyer's decision to accept employment, the value of his compensation, the viability of his commissions, and the promised equity. Defendants concealed them to induce his reliance, and Mr. Meyer suffered the damages alleged above.

**THIRTEENTH CAUSE OF ACTION**
**Aiding and Abetting Fraud Against Gomes**

128. Mr. Meyer repeats and realleges the preceding paragraphs.

129. Gomes had actual knowledge of the commission-deprivation scheme and materially assisted it by adopting the pricing change that destroyed commission value, inserting himself into and controlling the NHTSA relationship after Mr. Meyer created substantial value, and participating in the timing and consequences of Mr. Meyer's termination.

130. Gomes substantially assisted the underlying fraud and caused the damages alleged above.

**FOURTEENTH CAUSE OF ACTION**
**Fraudulent Commission Deprivation**

132. Mr. Meyer repeats and realleges the preceding paragraphs and pleads this fraud theory separately and in the alternative to his commission and contract claims.

133. Defendants induced Mr. Meyer to build pipeline and the NHTSA/DOT relationship while intending to control his access, manipulate deal economics after he created value, and terminate his participation before the account's larger value could be realized.

134. Defendants reduced the NHTSA price by approximately 99% without transition protection or compensation adjustment, reducing Mr. Meyer's expected commission from

approximately $37,500 to approximately $150, and later positioned the same account to pay full price under a new model after terminating him.

135. Defendants' account control, pricing manipulation, partial assurances regarding continued involvement, and termination timing deprived Mr. Meyer of commissions and upside he had earned or materially created, causing the damages alleged above.

## FIFTEENTH CAUSE OF ACTION
## Breach of Fiduciary Duty

136. Mr. Meyer repeats and realleges the preceding paragraphs and pleads this claim to the extent discovery establishes that Defendants undertook or owed fiduciary duties arising from their control over equity-plan assets, option information, commission proceeds, account-credit determinations, or other property or interests held for Mr. Meyer's benefit.

137. Defendants breached those duties by concealing material information, manipulating pricing and commission value, diverting or withholding compensation and account value, and acting for their own benefit at Mr. Meyer's expense.

138. Those breaches proximately caused damages in an amount to be determined at trial. Mr. Meyer seeks compensatory and equitable relief, disgorgement, an accounting, and any other relief permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

A. Declaring that Defendants violated the FLSA, NYLL, and other laws identified above;

B. Awarding unpaid overtime for approximately 15 to 20 overtime hours per week throughout the actionable period;

C. Awarding unpaid and untimely paid wages and commissions, including the approximately $37,350 NHTSA pricing differential and post-termination commissions on expansion, renewal, enterprise-license, and other value derived from accounts Mr. Meyer originated, cultivated, or materially advanced;

D. Awarding liquidated damages, statutory damages, civil penalties, and prejudgment and post-judgment interest;

E. Awarding back pay, front pay or reinstatement as appropriate, lost benefits, and all damages resulting from retaliation;

F. Awarding contract, quasi-contract, fraud, securities, fiduciary, and consequential damages, including the value of the promised 2,000 stock options, lost opportunities, and losses caused by acceptance of employment on false pretenses;

G. Ordering an accounting of all revenue, payments, expansions, renewals, licenses, transactions, and other value associated with NHTSA, DOT, Tantus, AWS, Four Points, and other accounts or opportunities Mr. Meyer originated, cultivated, or materially advanced;

H. Ordering disgorgement, rescission, constructive-trust relief, and other equitable relief as proved;

I. Awarding punitive damages on the common-law claims to the extent permitted;

J. Awarding reasonable attorneys' fees and costs; and

K. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: Huntington, NY
September 21, 2026

**TA LEGAL GROUP PLLC**
*Attorneys for Plaintiff Andrew Meyer*

By: ______________________________
Taimur Alamgir, Esq.
205 East Main Street, Suite 3-2
Huntington, NY 11743
(631) 498-7984
tim@talegalgroup.com